**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

March 15, 2022

**BY ECF AND EMAIL**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   **United States v. Lloyd Gunther**
      **21 Cr. 108 (JGK)**

Dear Judge Koeltl,

     For decades, Lloyd Gunther Rodriguez used a name that was not his own to build and maintain a life in this country. In the beginning, it was simply a way for him to navigate in a country that was not his birth country, after being brought here as a child. But, after creating a family of his own with his long-term partner, Ana Garcia, and their three daughters, Mr. Gunther came to depend on the lie to remain with his family in the place that his daughters and partner considered home. His conduct was desperate and damaging. For his actions, he has already been incarcerated pretrial at the Essex County Correctional Facility for 14 months. He has missed his daughters' birthdays, school dances, and nightly video game dates. This lengthy time in jail has been a hard lesson that he will never forget.

     The punishment for Mr. Gunther and his family does not end here. After the conclusion of this case, Mr. Gunther will have to address his lack of lawful status in this country, and faces the possibility of deportation. His lengthy and harsh pretrial confinement combined with the possibility of deportation are more than sufficient punishment for his first and only federal conviction. More time in jail is not necessary.

     At his sentencing hearing on March 29, 2022, I will respectfully ask the Court to sentence Mr. Gunther to a below-guidelines sentence of time served (equivalent to 14 months). Such a sentence, under all the circumstances, is "sufficient but not greater than necessary" to serve the purposes of sentencing as set out in 18 U.S.C. § 3553(a)(2).

I. **<u>Lloyd Gunther's Personal History and Characteristics</u>**

Lloyd Gunther Rodriguez is a citizen of the Dominican Republic. He was born there in August 1972 to Leccida Rodriguez and Dauner Gunther. PSR ¶ 57. He never had a relationship with his biological father, and only met him twice before his death. <u>Id</u>. Mr. Gunther's mother remarried when he was young, and left the Dominican Republic with her new husband, Lloyd Gutierrez, leaving Mr. Gunther with his maternal grandmother. When he was three years old, Mr. Gunther joined his mother and stepfather. PSR ¶ 59.

At three years old, Mr. Gunther did not know that he would be leaving the peace of his grandmother's home, for a home full of conflict and abuse at the hands of his stepfather. PSR ¶ 60. Guiterrez was an army veteran who suffered from alcohol addiction. When he drank, he became abusive towards Mr. Gunther and his mother. Sadly, Guiterrez began drinking more after the untimely passing of his own son in in 1983. <u>Id</u>. Mr. Gunther struggled in the home with his stepfather and his mother could not provide him with protection. As a result, Mr. Gunther briefly sought refuge in the Dominican Republic, returning to live with his grandmother for a few years as a teenager.

The trauma of his childhood, strained Mr. Gunther's relationships with family. He never developed a strong bond with his stepfather (now deceased), given his stepfather's demons. To this day, he has a distant relationship with his mother. <u>See</u> Exhibit A (Letter from Ana Garcia). Mr. Gunther has six half siblings between his mother and father, but has only sporadic contact with them. His partner, Ms. Garcia, describes Mr. Gunther's difficult family background in her letter to the Court: "Coming from a broken home, I think Lloyd has always dreamed of having a large and tight-knit family. He barely has a relationship with his mother. I have met his mother once, and his mother has no relationship with our children." <u>Id</u>.

Despite being born into difficult family circumstances, Mr. Gunther has succeeded in creating a loving and stable family of his own with Ms. Garcia. Their story together began over 20 years ago, when they met at the workplace of a friend. PSR ¶ 60; <u>See</u> Exhibit A. As Ms. Garcia describes it, their connection was "instant" and they have been together ever since. <u>See Id.</u> Together they have three daughters: ▇▇▇▇ 16, ▇▇▇▇ 12, and ▇▇▇▇ 10. Mr. Gunther is a loving a devoted father to his three girls. Ms. Garcia writes:

> [T]hroughout our kid's childhood, Lloyd dedicated himself to being a caring and present father. He is very active in their lives. We live in Miramar, Florida, and have a large lake behind our house. Lloyd will always take the girls kayaking, fishing, and swimming in the lake. He takes them to the park, on bike rides, and to do many other outdoor activities. Ever since moving to Florida, the girls have really taken up outdoor activities. Lloyd has really embraced this. He also loves to play video games with them. They are all very competitive, and sometimes I have to tell Lloyd to let the girls win! Lloyd is also a big foodie, so he

loves to take the girls out to eat. Their favorite place to go are Moe's Southwest Grille, Chili's, and occasionally on special occasions they go to Hard Rock Café.

Exhibit A.



*Lloyd Gunther on a family outing with Ana, ▮▮▮▮ ▮▮▮▮▮▮ and ▮▮▮▮*



*Christmas with Lloyd, ▮▮▮▮ ▮▮▮▮▮▮ and ▮▮▮▮ Gunther.*

Mr. Gunther's daughters mean the world to him and with his influence, they have developed into bright and artistic young women. He has always encouraged his girls to focus on their education. "Lloyd has always made it clear to them that their education is most important… To Lloyd's credit, all three of our daughters are in the gifted program and have dreams of attending prestigious colleges." Exhibit A. He has also nurtured their creative side. Early on, Mr. Gunther saw the immense artistic talent of his oldest daughter, ▮▮▮▮▮▮▮ loves drawing and creating graphic designs.



*A Father's Day Card created by ▮▮▮▮ for Mr. Gunther*



*▮▮▮▮▮ entry into a graphic design contest by Google.*

Mr. Gunther, Ms. Garcia, and ▉ worked together to create Glitched Art Collectibles, a family business focused on selling custom t-shirts with ▉ unique designs. The business also provides other embroidery and custom printing services.[1] Some of the devices found and retrieved from Mr. Gunther's home were used for the family's printing business.

Mr. Gunther is incredibly proud of his daughters and has always been driven by a desire to provide them with a stable, loving childhood where they are encouraged to dream big. While he has made mistakes over his fifty years, to his girls, Lloyd Gunther is still dad and "hero." See Exhibit B (Letter from ▉ Gunther).

## II. The Nature and Circumstances of the Offense of Conviction

Mr. Gunther was in his early twenties when he began using the identifying name and information of Wilson Alemany, a young man who would have been around his age were it not for his death in the 1980s. PSR ¶ 11. Use of Mr. Alemany's name, and at times the names of other individuals, permitted Mr. Gunther to establish and build a life in this country despite not having lawful status. After meeting his partner, and having children, Mr. Gunther further committed to an identity that was not his, using it to maintain a life and family that was his own.

Lloyd Gunther deeply regrets his conduct and the harm caused by his decision to live a lie rather than figure out a way to remain in this country lawfully. However, this is not a case where the victims themselves were harmed or deprived of their livelihoods on account of the lie. Mr. Gunther did not steal money from Mr. Alemany, who was deceased by the time that Mr. Gunther began using his information. He did not saddle Mr. Alemany or Mr. Collazo or their families with any debts or deprive them of government benefits. Moreover, while he is guilty of using false statements on a passport application, he was not actually approved for the passports he sought in 2011 (using the name Ezequiel Collazo) and 2017 (using the name Wilson Alemany).

## III. The Appropriate Sentence is Time Served (14 Months)

The parties have a plea agreement where we have stipulated to a guideline range of 21 to 27 months based on the offense characteristics and Mr. Gunther's criminal history. While the stipulated guideline range is consistent with the conduct that Mr. Gunther pled guilty to, the appropriate sentence is a below-guideline sentence of time served.

---

[1] https://www.glitchedartcollectibles.com/

5

### A. *The Court Has Broad Discretion to Determine the Appropriate Sentence.*

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013) (quoting United States v. Dorvee, 616 F.3d 174, 183 (2d Cir. 2010)). In determining the appropriate sentence, the Court must consider these purposes, as well as the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, the need to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, provide the defendant with medical care in the most effective manner, and avoid unwarranted disparities. See 18 U.S.C. § 3553(a).

"[T]he Sentencing Guidelines are just that, guidelines, and . . . 'they truly are advisory.'" Douglas, 713 F.3d at 700 (quoting Cavera, 550 F.3d at 189). Rather than deferring to the Guidelines, the Court "must make an individualized assessment based on the facts presented" and "may not presume that the Guidelines range is reasonable." Gall v. United States, 552 U.S. 38, 50 (2007); see also Dorvee, 616 F.3d at 182. In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487–88 (2011) (citations omitted).

### B. *Section 3553(a) Factors Support a Sentence of Time Served.*

Each of the Section 3553(a) sentencing factors supports a sentence of time served in this case and for this person. A sentence of 14 months' imprisonment would reflect the seriousness of the offense of conviction, would promote respect for the law, and would provide just punishment—particularly in this case where the offenses were non-violent and did not result in monetary harm to the victims. See 18 U.S.C. § 3553(a)(2)(A).

A sentence of time served would also provide both general and specific deterrence. See Id. § 3553(a)(2)(B). Three National Academy of Sciences panels have concluded, and empirical data have demonstrated, that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 CRIME & JUST. 1, 28 (2006). Mr. Gunther is already an example to others of the high likelihood of apprehension, conviction and substantial incarceration, for lying on a passport application, and a sentence exceeding 14 months is unnecessary to convince anyone who hears about this case that such conduct should be avoided.

With respect to specific deterrence, a sentence of time served would be a drastic penalty for Mr. Gunther, who has been convicted of his first federal crime and now faces deportation. He has never before faced immigration consequences for his conduct.

Moreover, as explained in the enclosed letters to the Court, the pain and anguish that Mr. Gunther's arrest, conviction, and incarceration have inflicted on his loved ones weighs heavily on Mr. Gunther, and is its own punishment. Mr. Gunther has not been able to see his partner or children in person since January 27, 2021. Their only communication for over a year has been by telephone or video conference, when permitted by Essex County. He has missed birthdays, school dances, and quiet nights at home hanging out with his girls. ▇▇▇ letter to the Court details the pain of her father's absence over the past year:

> I thought my dad would be home for Thanksgiving. When that didn't happen, I thought he'd be home for Christmas and New Years. Didn't happen again. I thought that, just maybe, he'd be home for my birthday. He would be able to shower me in love, embarrass me with a happy birthday song and push for me to get my permit so I can finally drive. Instead, we could only do a video call that lasted a couple of minutes.

Exhibit B.

His youngest, ▇▇▇, writes in her letter: "I miss everything about him." Exhibit C (Letter from ▇▇▇ Gunther). The impact of his absence has been devastating for Mr. Gunther. Mr. Gunther has had prior contacts with the criminal justice system and prior periods of incarceration, but these convictions and this absence have been particularly hard because his daughters are old enough to understand what is happening and articulate the pain of their father's absence.

Mr. Gunther is ashamed and chastened by harm he caused to his partner by living a lie for so long. Ms. Garcia has had to manage being the sole parent in the home with ailing parents, all while working to make sure she can earn enough money to take care of the rising costs of raising three girls. "I'm not sure how I will come out of all this hardship in one piece." Exhibit A.

Finally, Mr. Gunther has been punished by the lasting impact of the day of his arrest on his partner and daughters. Mr. Gunther was arrested on January 27, 2021, the day before ▇▇▇ 15th birthday –her quinceañera— a major birthday in Hispanic communities. Instead of preparing for a massive celebration, federal agents broke down the door to Mr. Gunther's home, stormed in, and arrested him at gunpoint while his daughters and partner stood by in terror and confusion. Mr. Gunther's daughters had never seen their father in this position before. For his non-violent conduct, he inadvertently exposed his daughters to the threat of violence in

7

their own home. The effects have been devastating and long lasting. "The girls are very scared whenever anyone knocks on the door. The day Lloyd was arrested, the police barged in and broke our door. Whenever someone knocks now, the girls all freak out and start crying. They were utterly traumatized by this incident." Id.

The scars that his daughters now have as a result of his actions, combined with 14 harsh and isolating months in pretrial confinement, are more than sufficient punishment. Each additional day away from his girls and his partner would impose devastating collective punishment on all of them, with no additional deterrent effect.

### C. The Ongoing COVID-19 Pandemic Supports a Sentence of Time Served.

The ongoing and unpredictable COVID-19 pandemic weighs against the imposition of a longer period of incarceration in this case. Every day that Mr. Gunther remains incarcerated during the ongoing pandemic, his life is at risk. Mr. Gunther runs the continued, elevated risk of catching COVID-19 while in the high-risk setting of congregate prison housing, with severely lacking medical care. The CDC has released a startling report on the rapid spread of the (less transmissible) Delta variant of COVID-19 among the incarcerated population in federal Bureau of Prisons (BOP) facilities. See Hagan LM et al., Outbreak of SARSCoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021, MMWR MORB MORTAL WKLY REP. 2021;70:1349 (Sept. 24, 2021).[2] Analyzing one BOP facility in Texas, the CDC reported that a July 2021 outbreak infected 74% of incarcerated individuals in an analyzed housing unit, including 70% of vaccinated detainees. Id. at 1349. These detainees were infected notwithstanding not only their vaccination (79% were vaccinated), but also the "[s]tandard COVID-19 prevention protocols that were in place among incarcerated persons includ[ing] mandatory masking in common areas, cohorting of housing units for daily activities, and head-to-toe sleeping arrangements"; the "prompt medical isolation of persons testing positive for SARS-CoV-2 and quarantine of exposed persons testing negative"; "the [e]nvironmental mitigation measures includ[ing] regular disinfection of common areas and high- touch surfaces and provision of individual bottles of disinfectant to incarcerated persons for use in their personal spaces"; and that "[h]ard plastic barriers were installed in visitation areas to prevent physical contact between incarcerated persons and visitors." Id.

As the CDC summarized, "[i]ncarcerated populations have experienced disproportionately higher rates of COVID-19-related illness and death compared with the general U.S. population, due in part to congregate living environments that can facilitate rapid transmission of SARS-CoV-2, the virus that causes COVID-19, and the high prevalence of underlying medical conditions associated with severe COVID-19." Id.

---

[2] https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7038e3-H.pdf

These data substantiate what courts in this District have repeatedly recognized:

> The COVID-19 pandemic poses health challenges that are themselves extraordinary. The novel coronavirus has infiltrated many of the BOP's prisons and jails, affecting inmates and staff. The nature of prisons—crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products—put those incarcerated inside a facility with an outbreak at heightened risk.

United States v. Zoquier-Solano, No. 13 Cr. 772 (JPO), 2020 WL 6193859, at *1 (S.D.N.Y. Aug. 10, 2020).

Although no one knows how the COVID-19 pandemic will progress, evolve, or (hopefully) wane, the unique risks it presents to vulnerable, incarcerated individuals like Mr. Gunther cannot be understated and should be taken into consideration in the evaluation of any potential sentence in this case, just as this Court has considered these factors in granting compassionate release applications. E.g., United States v. Monzon, No. 99 Cr. 157 (DLC), 2020 WL 4195272 (S.D.N.Y. June 2, 2020) (granting compassionate release application for defendant with 30-year sentence in light of applicant's cardiovascular disease and prior heart attack).

### D. The Excessive Harshness of Mr. Gunther's Incarceration Supports a Sentence of Time Served.

The extreme harshness of Mr. Gunther's incarceration during the pandemic further supports a sentence of time served.

Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." United States v. Sayoc, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019).

Mr. Gunther's period of detention, however, has been marked by conditions that far exceed the punitiveness of prison in "normal" times, including constant lockdowns and lock-ins (during which detainees cannot leave their cells for visits, calls, showers, or exercise; are provided cold food; and are unable to access the already limited services in the facility) caused by widespread violence and disorder, and the unmitigated outbreak of COVID-19 at Essex County Correctional Facility, where Mr. Gunther is being housed.

As a recent New York Times story summarized, over the past few months at Essex County Correctional, one inmate was stabbed to death and another was subjected to a prolonged, vicious attack by other inmates that was not interrupted by corrections officers for several minutes, during which the victim was attacked

9

with stomps, fists, a microwave, a water cooler, a broom, and an industrial bucket filled with bleach, and which left the victim in a coma for more than two months. See T. Tully, "He Went to Jail on Minor Charges. He Left in a Coma," N.Y. TIMES (Dec. 28, 2021).[3] In response to these events, the facility has imposed severe restrictions on the activities and programming of incarcerated persons, and has instituted days-long lockdowns that have restricted these individuals to their cells for prolong periods of time.

This already extraordinary harshness has been exacerbated by the COVID-19 pandemic. Upon his detention, Mr. Gunther was subject to quarantine in his facility, segregated from options for physical fitness, with limited access to personal hygiene and recreational activities, and unable to access certain prison services. Even after his initial quarantine period, daily activities are still subject to frequent and prolonged COVID-related restrictions, including ongoing lockdowns, and limitations on visits, commissary, laundry, telephone, and other congregate activities. For the past four months, as the Omicron variant has spread throughout the facility, personal and even legal visits have been suspended, and the facility has instituted multiple lock-ins, which have further increased the severity of incarceration by essentially reducing all inmates to segregated, punitive housing conditions. Information regarding the number of confirmed COVID cases at the facility is less accessible than it is for BOP facilities, but in announcing the closure of in-person visits in late December (before the onslaught of COVID cases accelerated), Essex County reported that 101 officers and 28 inmates had tested positive as of December 24, 2021. See S. Rodas, "N.J. Jail to pause in-person and attorney visits due to COVID surge," N.J. Advance (Dec. 24, 2021).[4]

As numerous courts in this District have recognized in imposing downward variances at sentencing, in reducing sentences, and in granting compassionate release applications in light of the harsh conditions of confinement during lockdowns and the COVID-19 pandemic, we respectfully submit that the Court should take into consideration that the current excessively harsh conditions of Mr. Gunther's confinement make every day served in prison more punishing than it should be. Cf., e.g., United States v. Cirino, No. 19 Cr. 323 (JSR) (S.D.N.Y.), Tr. 11:11–15 (July 17, 2020) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); United States v. Aracena de Jesus, No. 20 Cr. 19 (PAE) (S.D.N.Y.), Tr. 37:6–11 (July 1, 2020) (considering multiple COVID and security

---

[3] https://www.nytimes.com/2021/12/28/nyregion/prison-fight-beating-jayshawn-boyd.html
(last visited Mar. 2, 2022).

[4] https://www.nj.com/coronavirus/2021/12/nj-jail-to-pause-in-person-and-attorney-visits-dueto-
covid-surge.html (last visited Jan. 10, 2022).

lockdowns and finding that "[b]ottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest").

### E. Mr. Gunther's Immigration Troubles Warrant Consideration of a Time Served Sentence.

Mr. Gunther's legal troubles do not end with this case. Mr. Gunther's true identity is now known and the Immigration and Customs Enforcement Agency is aware of Mr. Gunther's presence in this country unlawfully. For the first time, Mr. Gunther faces adverse immigration consequences and deportation as a result of his conduct. His family is preparing for a future where Mr. Gunther does not return to their home in Florida. Ms. Garcia writes:

> We understand, as a family, that this incident might cause Lloyd to be deported to the Dominican Republic. My father lives there, and will help Lloyd get on his feet if he is to move there. My brother also lives there, and can help Lloyd get organized and find employment when he arrives. My kids and I will be able to visit him frequently, as it is a quick flight from Miami. It will be very hard for us to live without Lloyd around, but we will encourage him to build a life in the Dominican Republic. We will be there to support him as much as we can.

Exhibit A.

These preparations do not lessen the pain and punishment of further physical separation after the termination of Mr. Gunther's criminal case. This federal conviction, plus his 14 months in jail during the ongoing pandemic, have brought Mr. Gunther to a turning point. There is no going back and more jail is not necessary to ensure that he has learned his lesson.

## IV.   Conclusion

Lloyd Gunther is a loving father of three convicted of a non-violent offense that has carried significant and lasting consequences for him and his family. He now faces a future physically separated from his family. For all of the reasons described above, the substantial sentence of time served (14 months) is more than sufficient to fulfill the statutory purposes of sentencing in this case.

Respectfully submitted,

/s/_____

Zawadi Baharanyi

Assistant Federal Defender

(917) 612-2753

cc: AUSA Ashley Nicolas.